**COURT OF APPEALS
DECISION
DATED AND FILED**

**June 30, 2026**

Samuel A. Christensen
Clerk of Court of Appeals

**NOTICE**

This opinion is subject to further editing. If published, the official version will appear in the bound volume of the Official Reports.

A party may file with the Supreme Court a petition to review an adverse decision by the Court of Appeals. *See* WIS. STAT. § 808.10 and RULE 809.62.

**Appeal No. 2025AP2643**

**STATE OF WISCONSIN**

Cir. Ct. No. 2023TP21

**IN COURT OF APPEALS
DISTRICT III**

IN RE THE TERMINATION OF PARENTAL RIGHTS TO K. L. B., A PERSON UNDER THE AGE OF 18:

PIERCE COUNTY DEPARTMENT OF HUMAN SERVICES,

  PETITIONER-RESPONDENT,

 V.

K. D. B.,

  RESPONDENT-APPELLANT.

APPEAL from orders of the circuit court for Pierce County: THOMAS W. CLARK, Judge. *Affirmed.*

¶1 GILL, J.[1] Kevin appeals an order terminating his parental rights to his daughter, Kylie, and an order denying his motion for postdisposition relief.[2] Kevin contends that the evidence was insufficient to support the jury's verdict that grounds existed for the termination of his parental rights (TPR), that the circuit court erroneously exercised its discretion by concluding that the termination of his parental rights was in Kylie's best interests, and that the court erred by denying his postdisposition motion claiming that he received ineffective assistance of counsel during the jury trial. We disagree with each of Kevin's contentions and affirm.

## BACKGROUND

¶2 In December 2023, the Pierce County Department of Human Services (the County) filed a petition to terminate Kevin's parental rights to Kylie. The petition alleged that grounds for a TPR existed under WIS. STAT.

---

[1] This appeal is decided by one judge pursuant to WIS. STAT. § 752.31(2) (2023-24). All references to the Wisconsin Statutes are to the 2023-24 version.

Cases appealed under WIS. STAT. RULE 809.107 are "given preference and shall be taken in an order that ensures that a decision is issued within 30 days after the filing of the appellant's reply." RULE 809.107(6)(e). Conflicts in this court's calendar have resulted in a delay. It is therefore necessary for this court to sua sponte extend the deadline for a decision in this case. *See* WIS. STAT. RULE 809.82(2)(a); **Rhonda R.D. v. Franklin R.D.**, 191 Wis. 2d 680, 694, 530 N.W.2d 34 (Ct. App. 1995). Accordingly, we extend our deadline to the date this decision is issued.

[2] For ease of reading in this confidential matter, we refer to the appellant using a pseudonym rather than his initials, and we do the same for the child, the child's mother (Nora), and the child's foster mother (Julie). Nora's parental rights are not at issue in this appeal, and we discuss her only to the extent necessary to decide Kevin's appeal.

After filing his notice of appeal, Kevin moved to remand the case to the circuit court for factfinding regarding his claim of ineffective assistance of counsel, which we granted. We address both the circuit court's dispositional and postdisposition orders.

§ 48.415(2)(a), continuing need of protection or services, and under § 48.415(6), failure to assume parental responsibility.[3]

¶3      A three-day jury trial was held during the grounds phase of the TPR proceeding.[4]  Kendra Kinneman testified that she worked for the County as a child protection social worker and that she was Kylie's initial intake worker.  Kinneman stated that the County's involvement began in September 2020, when Kylie was two months old, and Kylie was removed from her parents' care and placed into out-of-home care in October 2020.  Kinneman noted that visits were not arranged between Kevin and Kylie at this time because Kevin was incarcerated, and the county jail did not allow visits between infants and parents.  Kinneman testified that Kylie's case was subsequently transferred to an ongoing social worker, Molly Mooridian.

¶4      Mooridian testified that she began working with Kylie in November 2020.  Mooridian stated that Kylie was adjudicated a CHIPS in June 2021 and that Kylie has not been reunified with either of her parents.  Mooridian further testified that, when she began working on Kylie's case, Kevin was being charged for domestic violence against Nora and was ultimately convicted of those related charges.  Kevin was released from custody "a few months into the ongoing

---

[3] *See* WIS. STAT. § 48.345 (setting forth the possible dispositions for a child in need of protection or services (CHIPS)).

[4] A contested TPR proceeding involves a two-step procedure. ***Sheboygan Cnty. DHHS v. Julie A.B.***, 2002 WI 95, ¶24, 255 Wis. 2d 170, 648 N.W.2d 402.  The first step is a factfinding hearing, during which a jury or circuit court determines "whether any grounds for the termination of parental rights have been" proven. ***Id.***, ¶26 (quoting WIS. STAT. § 48.424(3)).  The proceeding then moves to the second step, a dispositional hearing, at which the circuit court must consider the best interests of the child in determining whether to terminate the parent's rights or order another disposition. WIS. STAT. § 48.426(2).

[CHIPS] case." Mooridian testified that she communicated with Kevin at least monthly regarding Kylie's CHIPS case. Mooridian described these communications as "a little disjointed" because Kevin "appeared to be distracted" by things other than the conditions of Kylie's safe return, such as blaming Nora for the County's involvement with Kylie and stating that there should not be a CHIPS case.

¶5 Mooridian also discussed some of the conditions for Kylie's return and Kevin's performance on those conditions, which included the following: Kevin was ordered to have supervised visits with Kylie but he "frequently missed" those visits and "struggled" to behave appropriately at the visits he did attend; Kevin was ordered to participate in parental programming until he "benefitted substantially" from it, but he did not participate in the programming provided; and Kevin was ordered to maintain complete sobriety and report for regular drug testing, but failed to follow either order. Mooridian further noted that Kevin was ordered to complete multiple assessments and programming and to follow through with the assessors' recommendations, and she stated that Kevin failed to follow through with the recommendations.

¶6 Mooridian also addressed some "escalated engagements" that she had with Kevin, wherein he accused Mooridian and the County of intentionally mismanaging his case or "causing him ill will." Mooridian stated that Kylie was not returned to Kevin's custody. The CHIPS dispositional order and conditions for Kylie's return were admitted into evidence without objection.

¶7 Kim Stensland, Kylie's ongoing caseworker since March 2022, testified that she met or attempted to meet with Kevin regularly and that she kept a chart tracking Kevin's attendance at those meetings from May 2022 to September

2024, which was admitted into evidence without objection. The chart showed that Kevin attended 27 out of 49 meetings with Stensland.

¶8 Stensland also kept a chart tracking Kevin's visits with Kylie from February 2021 to September 2024, which was admitted into evidence without objection.[5] The chart showed that in 2021, Kevin attended 25 out of 31 visits. In 2022, Kevin attended 21 out of 42 visits and Stensland stated that some of the missed visits were due to Kevin's medical issues. In 2023, Kevin attended 21 out of 45 visits, and 1 visit was ended early because "[Kevin] was escalated." Stensland again noted that some of these missed visits were also due to Kevin's medical issues and being hospitalized. In 2024, Kevin attended 13 visits, did not attend 24 visits, and 1 visit was terminated early "due to behavior," although the chart did not specify whose behavior caused the visit to end early. Stensland also tracked Kevin's attendance at Kylie's speech and physical therapy appointments, including the fact that Kevin frequently did not attend those appointments because he did not feel that he needed to be a part of them or did not feel that he was getting anything out of them. Based upon the foregoing, Stensland concluded that Kevin did not meet the condition that he follow through with the family interaction plan.

¶9 Stensland testified that Kevin relapsed on cocaine in approximately June 2022 and that he was voluntarily engaging in services to address this relapse. Stensland also stated that Kevin sought mental health services on his own. Further, Stensland explained that while Kevin completed a number of the required

---

[5] Stensland did not explain how she began tracking Kevin's visits in 2021 when she did not begin working on Kylie's case until March 2022. Kevin did not address this apparent discrepancy at trial, nor does he raise any issue regarding these dates on appeal.

assessments for Kylie's return to his care, he did not follow through with the recommendations resulting from those assessments. Accordingly, Stensland opined that Kevin did not comply with the conditions for Kylie's return.

¶10 Julie, Kylie's foster mother, testified that Kylie began living with her and her husband in October 2020, when Kylie was approximately three months old. Julie then discussed Kylie's medical issues and noted that Kylie continues to have significant medical needs. Julie prepared an outline of Kylie's daily routine pertaining to her medical needs, which was admitted into evidence without objection.

¶11 Julie further testified that while Kylie has been in her care, Kevin has not provided any financial support to Kylie. However, she noted that Kevin has given Kylie age-appropriate clothing and toys, some birthday gifts, and some Christmas gifts. Julie stated that Kevin sent Kylie letters when he was in jail.

¶12 Susan Haugen testified about Kevin's parenting assessment that she conducted in September 2021. The assessment was based on collateral reports, interviewing social workers and Kevin's probation officers, and observing Kevin's visits with Kylie. Haugen testified that Kevin was limited in his ability to parent Kylie because he has a hand that only has a thumb on it, and damage to his arm, which made it difficult for Kevin to perform basic caretaking tasks for Kylie. Haugen stated that Kevin's difficulties caused her concern because Kylie "is medically fragile and has various disabilities and will continue to have various disabilities throughout her entire life."

¶13 Haugen also stated that Kevin has been diagnosed with schizophrenia, bipolar disorder, adjustment disorder with disturbance of conduct, and antisocial personality disorder, which Haugen characterized as "concerning."

Based on her assessment, Haugen recommended that Kylie not be returned to Kevin's care. Haugen prepared a report, consistent with her testimony, which was received into evidence without objection. Haugen stated that she prepared this report in 2021 and that she had not had any additional contact with Kevin or Kylie since then.

¶14 Deborah Knight, a life and wellness coach, testified about visits she supervised between Kylie and Kevin. Knight opined that Kevin had an "obvious love" for Kylie but that she had concerns for Kylie's overall safety with Kevin. Knight testified that, at the time of the grounds trial, she had been supervising Kylie's visits with Kevin for three years, but she had not ever recommended that Kevin be unsupervised with Kylie due to safety concerns. In particular, Knight was concerned about Kylie being given the correct medication, Kylie being physically safe, and Kylie being protected.

¶15 Myrna Rud and Catherine Parr testified about Kevin's housing, including that he rented an apartment from Rud from June 2022 to June 2023 and that he was receiving veteran housing services at the time of the trial. Sarah Gailey, a therapist, testified that Kevin participated in services from December 2021 up through 2024. A report showing Kevin's appointments with the clinic was admitted into evidence. Gailey wrote a letter in November 2023, which was also admitted into evidence, and stated that Kevin voluntarily sought treatment at

7

the clinic, that he engaged in "other mental health resources," and that he "successfully graduated from those services."[6]

¶16    Britny Knack testified that she worked for the Eau Claire County Department of Human Services, that she began working with Kevin in March 2023 through a voluntary program that "helps individuals struggling with mental health and/or substance abuse issues," and that she worked with Kevin for six months.  Knack stated that Kevin's goal in the program was to "cope with the worst situations possible" and that he believed he was "pretty stable in meeting" that goal after six months, which led to him graduating from the program.

¶17    Dawn Dutter, a substance use professional, testified that she began working with Kevin in March 2023 and that she continued to meet with him monthly for a period of six months.  Dutter stated that she worked with Kevin to develop a relapse prevention plan and that Kevin completed that plan.

¶18    Kevin testified that he served in the military from 1984 to 1988, that he injured his right hand in 1990 when working as a machine operator, and that this injury caused him to begin using drugs.  Kevin discussed Kylie's birth and her medical issues.  He stated he suspected that Nora was using drugs after Kylie was born, which caused him to confront Nora.  Kevin explained that he tried to satisfy some of the CHIPS conditions through programs available to him during his incarceration, but his ability to satisfy all the conditions was "limited" due to his

---

[6] Counsel for the County objected to the admission of Kevin's attendance report on the basis of foundation.  Kevin's counsel subsequently laid further foundation for the report, and the County did not further object to the report being admitted.  The County's counsel also objected to the admission of the November 2023 letter because one line of the letter "venture[d] into the area of impermissible character evidence."  The circuit court excised that line as character evidence and the letter was admitted into evidence without further objection.

incarceration. Kevin outlined the assessments he completed in jail. He also discussed other conditions for Kylie's return that he completed, including an AODA assessment, obtaining stable housing, and a domestic violence program. A certificate showing that Kevin completed the domestic violence program was admitted into evidence without objection.

¶19 Kevin added that after being released from custody, he moved to Eau Claire because that was the location of Kylie's foster home. Kevin also discussed his supervised visits with Kylie. Kevin stated he was happy to see his daughter and always brought her a gift for each visit.

¶20 Following the close of evidence, the jury returned a unanimous verdict that grounds existed to terminate Kevin's parental rights to Kylie due to continuing CHIPS and due to failure to assume parental responsibility.

¶21 At the dispositional hearing, Stensland testified that Kylie was adoptable and that her foster family had expressed a willingness to adopt her. Stensland noted that Kylie is "significantly bonded and attached to" her foster family and refers to her foster parents as "Mom and Dad." Stensland opined that Kylie's placement with her foster family appears to be a stable placement. Stensland also stated that the County was concerned about Kevin's ability to meet Kylie's needs. Kevin testified that he had missed many of his visits with Kylie due to his medical issues, that he and Kylie have "a very intimate relationship," and that Kylie loves him and he adores Kylie.

¶22 After the close of evidence, the circuit court made the following findings:

> I'm going to go through the factors…. [A]ll but three
> months of this virtually 5-year-old's life have been in the

care and the custody of the [foster] family. There was credible testimony from Ms. Stensland about the bonding between [Kylie] and the [foster] family, and bonding matters…. The likelihood of [the] child's adoption, based on testimony from Ms. Stensland, is high.

The age and health of the child at the time of disposition—age, like I said, is almost 5. [Kylie] is a child with astounding needs. She has been overcoming obstacle after obstacle after obstacle….

The [foster family has] supervised her needs since she was three months old…. [T]he [foster family has] demonstrated the ability to manage her substantial healthcare needs….

The evidence of missed placement, missed therapies, and simply length of placement relative to the age of the child dictate this Court's finding … and [the guardian ad litem] is right…. The substantial relationship looks from the child's eyes. Whether the child has a substantial relationship with [the] parent or other family members, the answer is no, not from [Kylie's] perspective.

And so the Court finds that there are no other relationships that are so substantial, and along with the relationship of [Nora] and [Kevin], there would be no harm to [Kylie] to sever those relationships. Wishes of the child, everyone said correctly this child is not even 5, almost 5 but not yet, so her wishes are a very limited factor. But [Kylie's guardian ad litem] indicates that the best interests of the child would be for termination.

Duration of separation, we've gone on and on about that. Whether the child will be able to enter a more stable and permanent family relationship upon TPR…. [B]y all evidence, particularly credible testimony from Ms. Stensland, … she will have a stable and permanent relationship upon TPR in the [foster family's] household.

Accordingly, the court concluded that it was in Kylie's best interests to terminate Kevin's parental rights, and it entered a TPR order.

¶23 Thereafter, Kevin filed a motion for postdisposition relief, requesting a new factfinding hearing "on grounds of ineffective assistance of counsel." Kevin argued that his trial counsel performed deficiently by failing to

10

object to the admission and use of Haugen's parenting assessment and that this deficiency prejudiced him because "[t]he jury heard unchallenged professional recommendations that effectively resolved dispositional issues, creating a substantial risk that the jury's grounds determination was influenced by best-interests considerations."

¶24    At a *Machner*[7] hearing, Kevin's trial counsel acknowledged that he could not recall being familiar with *Evelyn C.R. v. Tykila S.*, 2001 WI 110, 246 Wis. 2d 1, 629 N.W.2d 768, which discussed the separation of the grounds phase and the disposition phase of TPR proceedings. However, counsel stated that he was aware of the separate phases. Counsel testified that his general trial strategy was to show that the County was biased against Kevin and did not give him an opportunity to fulfill the conditions for Kylie's return. Counsel also stated that his strategy regarding Haugen was to highlight the lapses of time between her work in 2021, the filing of the TPR petition, and the October 2024 trial.

¶25    The circuit court denied Kevin's motion for postdisposition relief, concluding that Kevin's trial counsel did not perform deficiently and that Kevin was not prejudiced by his counsel's performance. The court reasoned that not objecting to evidence is a common defense strategy if objecting would call additional attention to the evidence and, accordingly, deciding not to object did not fall below professional norms. The court further stated that counsel emphasized the amount of time that had passed since Haugen's assessment in an attempt to undermine her credibility and that counsel's closing argument to the jury twice

---

[7] *See* **State v. Machner**, 92 Wis. 2d 797, 285 N.W.2d 905 (Ct. App. 1979).

emphasized concerns that the County was biased against Kevin. He was therefore not prejudiced by counsel's failure to object to Haugen's assessment.

¶26 Kevin now appeals.

## DISCUSSION

¶27 Kevin argues that the circuit court erred by denying his postdisposition motion because his trial counsel provided constitutionally ineffective assistance, that the evidence was insufficient to support the jury's verdict that TPR grounds existed due to continuing CHIPS, and that the court erroneously exercised its discretion by concluding that a TPR was in Kylie's best interests.[8]

## I. Kevin did not receive ineffective assistance of counsel.

¶28 Kevin argues that his trial counsel performed deficiently by failing to object to Haugen's "speculative" testimony and the admission of her report, and by expressing ignorance of controlling TPR law. Specifically, Kevin notes that his trial counsel admitted during the *Machner* hearing that he was unfamiliar with *Evelyn C.R.*, which Kevin states "mandates the strict bifurcation between the grounds phase and the dispositional phase." Kevin argues that all of counsel's

---

[8] Kevin additionally argues that there was insufficient evidence to support the jury's verdict that TPR grounds existed due to failure to assume parental responsibility. Because we conclude that there is sufficient evidence to support the jury's verdict regarding the ground of continuing CHIPS, we need not address Kevin's argument regarding failure to assume parental responsibility. *See Turner v. Taylor*, 2003 WI App 256, ¶1 n.1, 268 Wis. 2d 628, 673 N.W.2d 716 (noting that we need not address all issues when the resolution of one of those issues is dispositive).

claimed deficiencies allowed the jury to rely on "expert recommendations" that returning Kylie to Kevin would harm Kylie and not be in her best interests.

¶29 "A claim of ineffective assistance of counsel presents a mixed question of law and fact." *State v. Thiel*, 2003 WI 111, ¶21, 264 Wis. 2d 571, 665 N.W.2d 305. "Findings of fact will not be reversed unless they are clearly erroneous." *State v. Tourville*, 2016 WI 17, ¶16, 367 Wis. 2d 285, 876 N.W.2d 735. "Findings of fact include the 'circumstances of the case and … counsel's conduct and strategy.'" *State v. Pico*, 2018 WI 66, ¶13, 382 Wis. 2d 273, 914 N.W.2d 95 (citation omitted). The "ultimate determination of whether counsel's assistance was ineffective is a question of law, which we review de novo." *State v. Ortiz-Mondragon*, 2015 WI 73, ¶30, 364 Wis. 2d 1, 866 N.W.2d 717 (citation omitted).

¶30 To prevail on an ineffective assistance of counsel claim, a party must show "that [his or her] counsel's performance was deficient" and "that the deficient performance prejudiced" the party. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This two-prong test applies to ineffective assistance of counsel claims in TPR proceedings. *A.S. v. State*, 168 Wis. 2d 995, 1005, 485 N.W.2d 52 (1992). If a party "fails to satisfy either prong, we need not consider the other." *State v. Breitzman*, 2017 WI 100, ¶37, 378 Wis. 2d 431, 904 N.W.2d 93.

¶31 To demonstrate deficient performance, a party "must show that counsel's representation fell below an objective standard of reasonableness considering all the circumstances." *See State v. Dalton*, 2018 WI 85, ¶34, 383 Wis. 2d 147, 914 N.W.2d 120.

> We are "highly deferential" to counsel's decisions, provided they are objectively reasonable and strategic. However, we do not review the reasonableness of trial

> counsel's decisions with "the benefit of hindsight." We will not "second-guess a reasonable trial strategy, [unless] it was based on an irrational trial tactic or based upon caprice rather than upon judgment."

*State v. Mull*, 2023 WI 26, ¶35, 406 Wis. 2d 491, 987 N.W.2d 707 (alteration in original; citations omitted). "Counsel's performance need not be perfect, or even very good, to be constitutionally adequate." *Dalton*, 383 Wis. 2d 147, ¶35.

¶32 We conclude that Kevin has failed to prove that his trial counsel performed deficiently. In its order denying Kevin's postdisposition motion, the circuit court found that trial counsel's strategy, generally, was to show that the County was biased against Kevin and, pertaining specifically to Haugen, his strategy was to emphasize the amount of time that lapsed between Haugen's assessment and the County's decision to file a TPR petition. Kevin does not argue that these factual findings are clearly erroneous.

¶33 We agree with the circuit court that trial counsel's strategy was not objectively unreasonable. Kevin's trial counsel made a reasonable, strategic decision not to object to Haugen's testimony, as it supported counsel's trial strategy of showing that the County was biased because it did not want Kylie to be returned to Kevin's care long before the County filed a TPR petition. Consistent with that strategy, trial counsel emphasized to the jury that Haugen's assessment took place in 2021, over three years before the trial.

¶34 Kevin's argument that his trial counsel was ignorant of the fact that TPR cases are bifurcated is also without merit. While counsel acknowledged that he was unfamiliar with *Evelyn C.R.*, that case did not establish the rule that TPR proceedings are bifurcated. As the County correctly states, in support of the proposition that TPR cases are bifurcated, *Evelyn C.R.* cited to the Wisconsin

Supreme Court's prior opinion in *Waukesha County Department Services v. C.E.W.*, 124 Wis. 2d 47, 60, 368 N.W.2d 47 (1985), and to WIS. STAT. § 48.422. *See Evelyn C.R.*, 246 Wis. 2d 1, ¶25. More importantly, counsel stated that he was aware of the bifurcation, yet it did not affect his strategic decision not to object to Haugen's testimony. Accordingly, Kevin has failed to show that his counsel was deficient, and his ineffective assistance claim therefore fails.

## II. The evidence was sufficient to support the jury's verdict on the continuing CHIPS ground.

¶35    "Our review of a jury's verdict is narrow." *Morden v. Continental AG*, 2000 WI 51, ¶38, 235 Wis. 2d 325, 611 N.W.2d 659. On our review we,

> consider[] the evidence in a light most favorable to the jury's determination. We do so because it is the role of the jury, not an appellate court, to balance the credibility of witnesses and the weight given to the testimony of those witnesses. To that end, appellate courts search the record for credible evidence that sustains the jury's verdict, not for evidence to support a verdict that the jury could have reached but did not. If we find that there is "any credible evidence in the record on which the jury could have based its decision," we will affirm that verdict. Similarly, if the evidence gives rise to more than one reasonable inference, we accept the particular inference reached by the jury.

*Id.*, ¶39 (citations omitted).

¶36    The County alleged, and the jury found, that grounds for TPR existed due to continuing CHIPS. This ground must be proved by clear and convincing evidence. WIS. STAT. § 48.31(1). As relevant to this appeal, continuing CHIPS requires the County to prove that: (1) the child has been adjudged CHIPS and placed outside the home for a cumulative period of six months or longer pursuant to one or more court orders containing the TPR notice

required by law;[9] (2) the agency responsible for the care of the child and the family made a reasonable effort to provide the services ordered by the court;[10] and (3) the parent failed to meet the conditions established for the safe return of the child to the parent's home. *See* WIS. STAT. § 48.415(2)(a).

¶37    Kevin argues that the County did not present sufficient evidence to prove the second and third elements of continuing CHIPS. Kevin asserts that Stensland's charts tracking his attendance at various meetings "revealed a systemic bias" in how his absences were recorded because Stensland did not note that many of the absences were due to medical necessity and this omission "stacked the deck" against him, making it "impossible for the jury to reach a neutral or fair verdict" regarding his cooperation with the County. Kevin also notes that the County characterized Kevin as failing to meet conditions for reunification and as "stagnant," but he emphasizes that Knack and Dutter testified that he graduated from their programs. Kevin also contends that Stensland improperly adopted a dispositional stance at the grounds trial by opining that Kylie should not be returned to Kevin.

¶38    Kevin's argument largely consists of asking us to reweigh the evidence, which we are unable to do under our standard of review. *See **Morden***, 235 Wis. 2d 325, ¶¶38-39. Kevin is correct that while there was evidence in

---

[9] Pursuant to a stipulation between the County and Kevin, the circuit court answered this first question on the verdict form, which pertained to this element, "Yes" for the jury. Kevin does not dispute this element of the continuing CHIPS ground on appeal.

[10] "Reasonable effort" is defined as "an earnest and conscientious effort to take good faith steps to provide the services ordered by the court which takes into consideration the characteristics of the parent or child …, the level of cooperation of the parent … and other relevant circumstances of the case." WIS. STAT. § 48.415(2)(a)2.a.

support of the County's theory of the case, there was also evidence to support his theory of the case. However, this merely resulted in a factual dispute that was within the jury's province to decide. *See State v. David J.K.*, 190 Wis. 2d 726, 741, 528 N.W.2d 434 (Ct. App. 1994) ("It is for the jury, not this court, to resolve conflicts in testimony and determine the credibility of witnesses.").

¶39     As we stated above, we "will sustain a jury verdict if there is any credible evidence to support it." *Morden*, 235 Wis. 2d 325, ¶38. There was ample evidence to support the jury's verdict that the County made reasonable efforts to provide the services ordered by the circuit court, yet Kevin failed to meet the conditions for Kylie's safe return to his home. Kevin frequently missed scheduled supervised visits with Kylie, did not act appropriately at the visits he did attend, failed to complete the programming provided and follow the recommendations made by the County's assessors, and failed to maintain complete sobriety. Further, Kevin showed little ability to meet Kylie's significant needs and did not participate in her care and treatment. Under these circumstances, we will not disturb the jury's verdict. *See id.*

**III. The circuit court did not erroneously its discretion at the dispositional hearing.**

¶40     Kevin argues that the circuit court erroneously exercised its discretion during the disposition phase of the TPR process by failing to conduct an "on-the-record analysis" of the best interests factors provided in WIS. STAT. § 48.426(3) and by placing "excessive weight on the jury's finding of unfitness, effectively treating the disposition as a formality."

¶41     We review a circuit court's ultimate determination in a TPR proceeding for an erroneous exercise of discretion. *See State v. Margaret H.*,

2000 WI 42, ¶32, 234 Wis. 2d 606, 610 N.W.2d 475. A court "properly exercises its discretion when it examines the relevant facts, applies a proper standard of law and, using a demonstrated rational process, reaches a conclusion that a reasonable judge could reach." *Gerald O. v. Cindy R.*, 203 Wis. 2d 148, 152, 551 N.W.2d 855 (Ct. App. 1996).

¶42 During the dispositional phase of the TPR process, "'the best interests of the child' shall be the prevailing factor." *State v. B.W.*, 2024 WI 28, ¶7, 412 Wis. 2d 364, 8 N.W.3d 22 (citation omitted). In determining the child's best interests, the circuit court must consider the following nonexclusive list of factors:

> (a) The likelihood of the child's adoption after termination.
>
> (b) The age and health of the child, both at the time of the disposition and, if applicable, at the time the child was removed from the home.
>
> (c) Whether the child has substantial relationships with the parent or other family members, and whether it would be harmful to the child to sever these relationships.
>
> (d) The wishes of the child.
>
> (e) The duration of the separation of the parent from the child.
>
> (f) Whether the child will be able to enter into a more stable and permanent family relationship as a result of the termination, taking into account the conditions of the child's current placement, the likelihood of future placements and the results of prior placements.

WIS. STAT. § 48.426(3).

¶43 Kevin's argument that the circuit court failed to conduct an on-the-record analysis of each of the best interest factors is belied by the record. The court clearly addressed each of the best interest factors and applied the

evidence from the hearing to the factors. *See supra ¶22.* Kevin appears to merely disagree with the court's ultimate decision, but this disagreement does not mean the court erroneously exercised its discretion.

*By the Court.*—Orders affirmed.

This opinion will not be published. *See* WIS. STAT. RULE 809.23(1)(b)4.